Argued and submitted June 6, reversed and remanded July 6, 2023

Trevor DeHART,
Brian Shannon, and Dave Brown,
*Plaintiffs-Respondents,*
*and*
Renee POWELL,
*Plaintiff,*
*v.*
Debbie TOFTE,
AJ Schwanz, and Tamara Brookfield,
*Defendants-Appellants,*
*and*
Katherine BARNETT,
*Defendant.*

Yamhill County Circuit Court
21YAM0001CV; A177995

533 P3d 829

In this case involving claims under Oregon's "anti-doxing" statute, ORS 30.835, defendants appeal a limited judgment denying their special motions to strike under Oregon's anti-SLAPP statute, ORS 31.150. Defendants assign error to the trial court's denial of their special motions to strike. *Held*: The trial court erred in denying defendants' special motions to strike. Defendants met their burden of making a *prima facie* showing that plaintiffs' claims arose out of conduct in furtherance of the constitutional right of free speech in connection with a public issue or an issue of public interest. Further, plaintiffs did not meet their burden to make a *prima facie* case that a reasonable person in their position would suffer "severe emotional distress" within the meaning of Oregon's anti-doxing statute.

Reversed and remanded.

Jennifer K. Chapman, Judge.

Athul K. Acharya argued the cause for appellants. Also on the briefs were Kelly Simon, Shenoa Payne, Rian Peck, and ACLU Foundation of Oregon.

Paige M. Chrz argued the cause for respondents. On the brief were Daniel E. Thenell, Emerson Lenon, and Thenell Law Group, P.C.

Before Tookey, Presiding Judge, and Kamins, Judge, and Hadlock, Judge pro tempore.

TOOKEY, P. J.

Reversed and remanded.

**TOOKEY, P. J.**

In this case involving claims brought under Oregon's recently enacted "anti-doxing" statute, ORS 30.835,[1] three defendants appeal a limited judgment denying their special motions to strike under Oregon's anti-SLAPP statute, ORS 31.150.[2]

Each of the three plaintiffs in this case is an elected public official—namely, an elected director on the Newberg School District Board (the School Board). Each plaintiff voted on a motion directing the superintendent of Newberg public schools to, among other things, "remove all Black Lives Matter (aka BLM) signs, flags, and placards, apparel, buttons, and all other modes of display, and all instances of the symbol known as the Pride Flag from District facilities immediately" (the Ban).

Following the Ban, defendants—each of whom has a child or children attending Newberg public schools, and each of whom disagreed with the Ban—posted information

---

[1] Doxing, sometimes spelled "doxxing," is "shorthand for 'dropping documents.'" Svana M. Calabro, *From the Message Board to the Front Door: Addressing the Offline Consequences of Race- and Gender-Based Doxxing and Swatting*, 51 Suffolk U L Rev 55, 57 (2018). It has various definitions, but broadly speaking, it is "the public release of an individual's personal information." *Id.*; *see also* Frank D. LoMonte & Paola Fiku, *Thinking Outside the Dox: The First Amendment and the Right to Disclose Personal Information*, 91 UMKC L Rev 1, 4-5 (2022) ("What we now know as 'doxing' first emerged in the 1990s in the world of online hackers, in which people operated through anonymized screen names. If a feud broke out among hackers, or a member of a hacking group was perceived as having violated group norms, a squealer would 'drop docs' on the perceived wrongdoer by exposing the person's true offline identity. Eventually, 'docs' became 'dox,' lost the 'drop,' and evolved as a verb, sometimes written with an extra 'x' as 'doxxing.'" (Footnotes omitted.)).

Some commentators have attempted to categorize doxing based on the intent of the person "dropping dox." For example, in *The Doxing Dilemma: Seeking a Remedy for the Malicious Publication of Personal Information*, 85 Fordham L Rev 2451, 2457 (2017), Julia M. MacAllister recognized three categories of doxing: "(1) punching down doxing (*i.e.*, doxing for purely malicious purposes); (2) doxing for political purposes; and (3) the use of doxing by members of anonymous online communities as a tool for internal regulation (*i.e.*, 'unmasking')."

The pertinent text of Oregon's anti-doxing statute, and a discussion of its purpose, is set forth below, 326 Or App at 725-30.

[2] The acronym "SLAPP" stands for "strategic lawsuits against public participation." *Handy v. Lane County*, 360 Or 605, 612 n 4, 385 P3d 1016 (2016).

The pertinent text of Oregon's anti-SLAPP statute, and a discussion of its purpose, is provided below, 326 Or App at 724-25.

about plaintiffs' employers in a private Facebook group called "Newberg Equity in Education" (NEEd).[3] After learning of defendants' conduct, plaintiffs brought suit under Oregon's anti-doxing statute, which creates a cause of action for "improper disclosure of private information," alleging that they suffered "severe emotional distress" as a result of the disclosures.[4] Defendants then filed special motions to strike under Oregon's anti-SLAPP statute, which the trial court denied.

As explained below, this case requires us to consider whether, under Oregon's anti-SLAPP statute, each defendant's conduct was "in furtherance of the exercise of the *** constitutional right of free speech in connection with a public issue or an issue of public interest." It also requires us to consider whether each defendant's conduct would cause a reasonable person who is serving as an elected public official to suffer "severe emotional distress" as that term is used in Oregon's anti-doxing statute.

---

[3] "Facebook" is one of "the most popular global" "social networking sites"—*i.e.*, "web-based social communities of users with similar interests or affiliations who interact with one another by sharing photos or images, exchanging text or instant messages, playing games and so on." Asma A.I. Vranaki, *Regulating Social Networking Sites: Facebook, Online Behavioral Advertising, Data Protection Laws and Power*, 43 Rutgers Computer & Tech L J 168, 170 (2017). Among other activities a person with a Facebook account can engage in when using Facebook is "join[ing] groups with other users with whom they share a tie (*e.g.*, college) or a common interest" (*e.g.*, equity in education). *See* Jason Mazzone, *Facebook's Afterlife*, 90 N C L Rev 1643, 1647 (2012) (describing various actions users of Facebook can take when using Facebook).

Facebook groups such as NEEd can be categorized by the level of privacy they provide. On one end of the spectrum is a "public group," in which anyone can see what has been posted in the group.

At the other end of the spectrum is a "secret private group." With a "secret private group," only members of the group can see what has been posted. Additionally, to join a "secret private group," a Facebook user must receive an invitation to join the group from a current group member, and a "secret private group" does not show up in any searches using the Facebook search tool.

As discussed below, NEEd is a "visible private group," which means only members of the group can see what has been posted. However, unlike a "secret private group," anyone who has a Facebook account can request to join a "visible private group." After a request is made, an administrator of the "visible private group" must approve the request before the person who made the request can join the group and see the posts that have been made to the "visible private group" or post in the "visible private group" themselves.

[4] In their complaint, plaintiffs alleged that they were "harassed" by the disclosures, which, as described below, is defined in the anti-doxing statute to mean, in part, that they suffered "severe emotional distress." ORS 30.835(1)(c).

For the reasons explained below, we conclude that the trial court erred in denying defendants' special motions to strike. We conclude that each defendant's conduct was "in furtherance of the exercise of the * * * constitutional right of free speech in connection with a public issue or an issue of public interest."

Further, in our view, accounting for the circumstances surrounding defendants' disclosures of the various plaintiffs' employment information—including that each plaintiff was a public official and that each plaintiff had affirmatively and separately publicized the identity of each of their employers—we conclude that plaintiffs did not make a *prima facie* case that a reasonable person in their positions would suffer "severe emotional distress" within the meaning of Oregon's anti-doxing statute, and, therefore, did not meet their burden under Oregon's anti-SLAPP statute to establish a *prima facie* case. Consequently, we reverse the limited judgment and remand.

## I. STATUTORY CONTEXT

Before describing the factual and procedural history of the instant case and setting forth our analysis, we think it useful to describe the statutory context in which this appeal arises.

### A. *Oregon's Anti-SLAPP Statute Generally*

Oregon's anti-SLAPP statute is codified at ORS 31.150. As noted above, the acronym "SLAPP" stands for "strategic lawsuits against public participation." *Handy v. Lane County*, 360 Or 605, 612 n 4, 385 P3d 1016 (2016). The statute "provides a mechanism for a defendant who is sued over certain actions taken in the public arena to have a questionable case dismissed at an early stage." *C.I.C.S. Employment Services v. Newport Newspapers*, 291 Or App 316, 320, 420 P3d 684 (2018) (internal quotation marks omitted). The anti-SLAPP statute allows defendants, before incurring significant expenses, "to expeditiously move to dismiss nonmeritorious claims that were filed in a strategic effort to chill participation in public affairs." *Id.*; *Staten v. Steel*, 222 Or App 17, 32, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009) ("The purpose of the special motion to

strike procedure, as amplified in the pertinent legislative history, is to expeditiously terminate *unfounded* claims that threaten constitutional free speech rights, not to deprive litigants of the benefit of a jury determination that a claim is *meritorious*." (Emphases in original.)).

There are two steps in an anti-SLAPP motion. In the first step, a defendant making a special motion to strike has the burden to make a *prima facie* showing that the plaintiff's claim is of the type described in ORS 31.150(2). ORS 31.150(3). Relevant to this case is ORS 31.150(2)(d), which allows defendants to move to strike any claim in a civil action that arises out of "conduct in furtherance of the exercise of * * * the constitutional right of free speech in connection with a public issue or an issue of public interest." If the defendant meets the burden of making that *prima facie* showing, then at the second step, "the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a *prima facie* case." ORS 31.150(3). The court's role at that juncture is "not to weigh the evidence but to determine whether the plaintiff has presented substantial evidence in support of a *prima facie* case on the claim." *Mohabeer v. Farmers Ins. Exchange*, 318 Or App 313, 316, 508 P3d 37, *rev den*, 370 Or 212 (2022).

In considering special motions to strike pursuant to ORS 31.150, we "liberally" construe the statute "in favor of the exercise of the rights of expression" it protects. ORS 31.152(4); *see also C.I.C.S. Employment Services*, 291 Or App at 320 (so stating). We note that although Oregon's anti-SLAPP statute was modeled after California's anti-SLAPP statute, the Supreme Court has observed that California cases decided after "2001 are relevant, at most, only for their persuasive value." *Handy*, 360 Or at 623 n 5. In this opinion, when we cite cases interpreting California's anti-SLAPP statute decided after 2001, we do so because we believe them to be persuasive.

B.	*Oregon's Anti-Doxing Statute Generally*

In 2021, in response to "numerous concerning incidents where individuals have been doxed," the Oregon Legislative Assembly enacted an "anti-doxing" bill, House Bill

(HB) 3047 (2021), which is presently codified at ORS 30.835. Or Laws 2021, ch 300, § 1; Testimony, Senate Committee on Judiciary and Ballot Measure 110 Implementation, HB 3047, May 12, 2021 (statement of Kimberly McCullough, Legislative Director, Oregon Department of Justice). Although doxing has various definitions, a staff measure summary provided to legislators defined it as the "disclosure of an individual's personal information for the purpose of harassing or harming the individual." Preliminary Staff Measure Summary, Senate Committee on Judiciary and Ballot Measure 110 Implementation, HB 3047, May 12, 2021; *see State Treasurer v. Marsh & McLennan Companies, Inc.*, 353 Or 1, 12-13, 292 P3d 525 (2012) (using staff measure summary to understand the legislature's intent).

As enacted, HB 3047 creates a cause of action "for improper disclosure of private information" if the plaintiff establishes "by a preponderance of the evidence" that:

"(a)   The defendant, with the intent to stalk, harass or injure the plaintiff, knowingly caused personal information to be disclosed;

"(b)   The defendant knew or reasonably should have known that the plaintiff did not consent to the disclosure;

"(c)   The plaintiff is stalked, harassed or injured by the disclosure; and

"(d)   A reasonable person would be stalked, harassed or injured by the disclosure."

ORS 30.835(2). Additionally, ORS 30.835(1) provides the following definitions:

"(a)   'Disclose' includes, but is not limited to, transfer, publish, distribute, exhibit, advertise and offer.

"(b)   'Injure' means to subject another to bodily injury or death.

"(c)   'Harass' means to subject another to severe emotional distress such that the individual experiences anxiety, fear, torment or apprehension that may or may not result in a physical manifestation of severe emotional distress or a mental health diagnosis and is protracted rather than merely trivial or transitory.

"(d)   'Personal information' means:

"(A)   The plaintiff's home address, personal electronic mail address, personal phone number or Social Security number;

"(B)   Contact information for the plaintiff's employer;

"(C)   Contact information for a family member of the plaintiff;

"(D)   Photographs of the plaintiff's children; or

"(E)   Identification of the school that the plaintiff's children attend.

"(e)   'Stalk' means conduct constituting the crime of stalking under ORS 163.732 or conduct that would give rise to an action for issuance or violation of a stalking protective order under ORS 30.866."

A plaintiff who prevails on a claim for "improper disclosure of private information" under ORS 30.835 can recover economic and noneconomic damages, punitive damages, injunctive relief, reasonable attorney fees, and any other appropriate equitable relief. ORS 30.835(3).

HB 3047 was originally a product of work undertaken by the Joint Committee on Transparent Policing and Use of Force Reform.[5] Testimony, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 1, 2021 (statement of Rep Janelle Bynum). During hearings on the bill, legislators heard about the pervasive nature of doxing and significant harm caused to individuals who have been doxed. By way of just a few of the many possible examples found in the legislative history of HB 3047, a cosponsor of the bill, Representative Janelle Bynum, testified that she had heard from "constituents, journalists, advocates, organizers, and members of law enforcement who were negatively impacted by doxxing," and that doxing had become "a tool of oppression that forced people into shells of their former selves and even forced families to take monumental steps to protect themselves." Testimony, House Committee on Judiciary,

---

[5] The Joint Committee on Transparent Policing and Use of Force Reform was created during a 2020 special session of the legislature and was authorized to conduct business during sessions of the legislature, "any recess thereof," and "in the interim between sessions." HB 4201 (2020).

Subcommittee on Equitable Policing, HB 3047, Mar 1, 2021 (statement of Rep Janelle Bynum). Aaron Knott, the Policy Director for the Multnomah County District Attorney's Office, testified that there are instances where pictures of houses belonging to prosecutors in the Multnomah County District Attorney's Office had been posted online with captions such as, "We know where your kids are, do you?" Audio Recording, Senate Committee on Judiciary and Ballot Measure 110 Implementation, HB 3047, May 12, 2021, at 52:00 (comments of Aaron Knott). Knott also testified that he was aware of the doxing of defense attorneys, probation officers, Department of Human Services caseworkers, and "political activists across the entirety of the political spectrum." *Id*. A legislator, Representative Bill Post, testified that he was doxed on Twitter by a "national journalist" with 1.5 million followers, and that that journalist posted information to Twitter including Representative Post's Social Security number, his personal phone number, his wife's phone number, his wife's name, his son's phone number, his chief of staff's phone number, and a picture of his house, along with a message that said, "Don't bring a gun to a bazooka fight." Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 10, 2021, at 43:11 (comments of Rep Bill Post).[6] As a result of that doxing, Post had to change his bank accounts and credit cards, and received unwanted phone calls. *Id*. And Jon Isaacs, Vice President of Government Affairs for the Portland Business Alliance, testified as to the "unheard of attacks on the homes of elected officials" in Portland that had occurred as a result of doxing, including one that put an "entire building of residents at risk." Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 1, 2021, at 51:00 (comments of Jon Isaacs).

Notwithstanding the pervasive nature and significant harm caused by doxing, the actual cause of action created by the legislature in HB 3047 was written "very, very narrowly," in part to accord with the dictates of Article I,

---

[6] Representative Post explained that the journalist claimed that Post had actually doxed the journalist first, when Post posted a link on Facebook to a ballot measure petition on the Secretary of State's website that identified the journalist as the individual behind the ballot measure petition. Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 10, 2021, at 44:06 (comments of Rep Bill Post).

section 8, of the Oregon Constitution.[7] Audio Recording, Senate Committee on Judiciary and Ballot Measure 110 Implementation, HB 3047, May 12, 2021, at 52:40 (comments of Aaron Knott). Article I, section 8, provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

In particular, as originally introduced, HB 3047 did not contain a definition for what it meant to "harass" or "injure" someone as those terms were used in HB 3047, and also provided that distributing "personal information" with the intent to "humiliate" was actionable under the proposed cause of action. HB 3047, Introduced (Jan 26, 2021). HB 3047 was amended after a representative from the Anti-Defamation League (ADL), Lauren Krapf, raised concerns that the introduced version of the bill could "capture conduct that involves identifying people online where the purpose may be to protect others, tamp down extremists, or report on a public interest story." Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 1, 2021, at 44:08 (Lauren Krapf, National Policy Counsel, ADL). As Krapf saw it, holding "someone accountable for doxing because they have an intent to humiliate someone is overly broad and brings about the potential for capturing expressive conduct that ought to be protected [by] our civil liberties," and noted that when "it comes to online harassment there is a fine line to walk, and it is important we do so when enacting anti-doxing legislation." *Id*.[8]

---

[7] Aaron Knott explained that HB 3047 was not intended to provide a cause of action where the defendant did not intend a "constitutionally recognized harm," for example, where a person "put somebody's personal information online *** to expose them to political speech"—*i.e.*, where the subject of the doxing is an "elected official and [the person doing the doxing] think[s] they need to hear from their constituents." *See* Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 1, 2021, at 25:05 (comments of Aaron Knott).

[8] The ADL has been described as "one of the nation's most respected human rights organizations." LoMonte & Fiku, 91 UMKC L Rev at 10. Frank D. LoMonte, Professor and Director of the Joseph L. Brechner Center for Freedom of Information at the University of Florida notes that the ADL

> "has a complicated relationship with the concept of doxing. The ADL has called for legislation to outlaw the release of information with intent to

As a result of Krapf's testimony—along with subsequent contributions by the ADL, the Multnomah County District Attorney's Office, and the Oregon Department of Justice—HB 3047 was amended to replace the word "humiliate" with the word "stalk," and to define "stalk" as conduct "constituting the crime of stalking under ORS 163.732" and conduct that would "give rise to an action for issuance or violation of a stalking protective order under ORS 30.866." Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 17, 2021, at 11:11 (comments of Michael Lantz); Or Laws 2021, ch 300, § 1. The amendments also added definitions for the word "injure" and "harass," such that the word "injure," as used in the anti-doxing statute, means to subject another person "to bodily injury or death," and "harass," as used in the anti-doxing statute, means, in pertinent part, to subject another person "to severe emotional distress." Or Laws 2021, ch 300, § 1.

## II.   FACTUAL AND PROCEDURAL HISTORY

With that statutory context, we turn to the pertinent factual and procedural history. We take "the following facts from the pleadings and from the supporting and opposing affidavits submitted to the trial court, ORS 31.150(4), and state them in the light most favorable to plaintiffs." *Mullen v. Meredith Corp.*, 271 Or App 698, 702, 353 P3d 598 (2015) (internal quotation marks omitted). We note that

---

cause harassment, while also supporting the unmasking of white supremacists and other wrongdoers. In a blog post setting forth its position, the ADL explained: 'Unlawful doxing is different from the work that activists and researchers—including those at ADL—are now engaging in to identify extremists and help law enforcement agencies investigate the rioters who violently stormed the Capitol. These activists and researchers are not operating with a criminal mental state. The same goes for journalists who break important stories, people who take on powerful institutions and interests by disclosing information (for example about the source of political donations), and people who report abuses of power or otherwise act as whistleblowers.'"

*Id.* (brackets omitted). Despite concerns about the breadth of the originally introduced version of Oregon's anti-doxing bill, the ADL supported enactment of the amended version of the bill which was codified as ORS 30.835. Audio Recording, Senate Committee on Judiciary and Ballot Measure 110 Implementation, HB 3047, May 12, 2021, at 54:30 (comments of Matthew Kahl, Vice Chair, Advisory Board, Anti-Defamation League Pacific Northwest Region).

the facts material to our analysis in this case are largely undisputed.

A.   *The NEEd Facebook Group*

The NEEd Facebook group was created in the summer of 2020 after plaintiff Brown, who was a director on the School Board, voted against Resolution 2020-04, entitled "A Resolution of the Newberg School Board of Directors Condemning Racism and Committing to Being an Anti-Racist School District."

In response to that vote, a friend of defendant Schwanz started "an online discussion about next steps for anti-racism work to take place in Newberg Public Schools." That discussion became the NEEd Facebook group, which at the time of the events giving rise to plaintiffs' lawsuit, had around 649 members.[9]

NEEd's membership consists mostly of parents of students in Newberg public schools, but it also includes teachers and other community members. Everyone in the group "believes that education must be equitable, including proactively anti-racist." NEEd is a "visible private group" on Facebook, which means that someone "needs to request to join, and an administrator must approve their request, before they can see the group's posts or post to the group themselves." Administrators decided to make NEEd a private group "so that [they] could communicate [the] group's purpose and the tone of mutual respect we expect from all of our members; ask people to fill out a couple of questions to help confirm that they understand [the] group's purpose and agree to engage in respectful and civil discourse; and ensure that the group stays focused on promoting equity in Newberg Public Schools." Topics discussed in the NEEd group included "upcoming School Board meetings; topics on the Board's agenda; how to submit comments to the Board if members so wish; news articles relevant to [NEEd's] discussions; anti-racist learning resources; etc."

---

[9] Facebook was chosen to host NEEd because it "is ubiquitous, and [the founders of the NEEd group] believed that most people who would want to participate in the discussions would already have a Facebook account." Additionally, it was "free to use, which remove[d] the financial barrier to access the group," as long as "a person has a way to connect to the internet."

B.  *The Ban*

During the 2021-2022 academic year, each plaintiff served as a director on the School Board, an elected position, with plaintiff Brown as Board Chair and plaintiff Shannon as Vice-Chair. During a July 2021 School Board meeting, Shannon moved

> "that the Newberg Dundee School District Board of Directors direct the Superintendent to remove all Black Lives Matter (a.k.a. BLM) signs, flags, placards, and all instances of the symbol known as the Pride flag from district facilities immediately and direct the policy committee to draft policy language prohibiting the display of political signs, flags, and placards, in district facilities with the sole exception of the American flag and the Oregon state flag."

Shannon's motion was tabled, but community members opposed to the Ban attended weekly protests, and approximately 500 people emailed the School Board to submit comments about Shannon's motion.

The next board meeting took place on August 10, 2021. At that meeting, after comments from many members of the Newberg community regarding Shannon's motion (both in support and opposed), the three board members who are plaintiffs in this suit—Brown, Shannon, and DeHart—voted to approve an amended version of Shannon's motion, and the Ban was passed.[10] The Ban received both local and national media coverage, drawing coverage from, among other sources, Oregon Public Broadcasting and the Washington Post.

---

[10] The amended version of Shannon's proposal provided:

"That the Newberg-Dundee School District Board of Directors direct the Superintendent to remove all Black Lives Matter (aka BLM) signs, flags, and placards, apparel, buttons, and all other modes of display, and all instances of the symbol known as the Pride Flag from District facilities immediately, and direct the Policy Committee to draft policy language prohibiting the display of political signs, flags, apparel, buttons, and placards, and all other modes of display from District facilities, with the sole exception of the American Flag and Oregon state flag, with exemptions as it sees proper. The language contained in this directive shall only apply to District staff and faculty while in the performance of their official duties as District employees."

Another director on the School Board, Powell, also voted in favor of the Ban. Powell was originally a plaintiff in this suit but has since dropped her claim.

The other three directors on the School Board voted against the Ban.

C.  *Defendants and Their Conduct After the Ban*

Defendants' conduct that gave rise to this lawsuit occurred after the Ban, and is most easily understood by describing each defendant and their conduct individually.

1.  *Defendant Schwanz*

Plaintiffs' claim against defendant Schwanz arises from information she posted to the NEEd Facebook group regarding plaintiff Brown.

Defendant Schwanz has three children who attend Newberg public schools. She has taken on substantial volunteer roles in the Newberg School District—*e.g.*, serving as a representative on the district's budget committee, serving on several hiring committees, and supporting the campaigns of two school board candidates. Schwanz was also a co-administrator of NEEd and historically was one of the most active posters in the group.

After the Ban, a former Newberg public school student "reshared" a "tweet"[11] on the online messaging service Twitter about alleged conduct undertaken by Brown while Brown was working as a coach at Newberg High School— namely, that Brown had made racist comments and also laughed after an assistant coach used a demeaning and offensive term in reference to students at the school. A member of the NEEd Facebook group reposted the former student's tweet in the NEEd Facebook group. The information in the tweet concerned Schwanz, because Schwanz was aware that Brown was coaching students as the Head Coach for the Canby High School Girls Tennis Program. Schwanz was aware of Brown's work as a coach at Canby High School because Brown had made statements to local media—namely, the *Canby Herald*—regarding that work, and had also commented on that work during at least one board meeting.

Schwanz believed that "any student who had experience with Chair Brown in his capacity as a Head Coach

---

[11] A "tweet" is a post on the Twitter online message service. *Merriam-Webster.com Dictionary*, http://merriamwebster.com/dictionary/tweet (accessed May 12, 2023).

should feel empowered to report their experiences (whether good or bad) to the Canby Athletic Director." She subsequently found the Canby Athletic Director's contact information via a Google search and, on August 15, 2021, posted the following message on the NEEd Facebook group:

> "Chair Brown is currently employed by the Canby School District as the girls' tennis coach.
>
> "If you know of students who have been coached by Chair Brown, please encourage them to share their stories/ concerns with the Canby Athletic Director:
>
> "[Athletic Director's name]
>
> "Associate Principal / Athletic Director - Canby High
>
> "[Athletic Director's work phone number]
>
> "[Athletic Director's work email address]"[12]

With her post, Schwanz also posted two links: first, a link to the Oregon School Activities Association webpage for Canby High School, and second, a link to a *Canby Herald* article in which Brown discussed both his coaching position at Canby High School and his service on the School Board.

We note that, when Brown was running for his position on the School Board, he publicly referenced his years of coaching students and serving as security at Newberg High School as a qualification for being elected to the School Board.

In a declaration submitted by Schwanz in connection with her anti-SLAPP motion, Schwanz explained that her intent when posting the athletic director's contact information was to "(1) give high school students access to information they may need to report safety issues about a coach at their public school; and (2) to help Chair Brown understand the harmful effects of the policies he was promoting as a Director of the Newberg School Board."

---

[12] As indicated, Schwanz's post contained the athletic director's name, work phone number, and work email address. We have omitted that information in the quote above, which seems fitting in an opinion concerning claims arising under Oregon's anti-doxing statute. *See* 326 Or App at 722 n 1 (describing "doxing" as "the public release of an individual's personal information").

According to a declaration submitted by Brown, after Schwanz's post containing the athletic director's contact information and soliciting students who had experiences with Brown to contact the athletic director, Brown suffered "severe emotional distress"—namely, "anxiety, fear, and apprehension"—due to Schwanz's post. Specifically, Brown averred that he has "trouble sleeping" and now "wakes up to any noise" in his house, and though he used to keep his garage door open, he does not keep his garage door open anymore because he fears "someone entering his garage." Brown also averred that he "has reason to believe [his] employer received unsolicited contacts" in response to defendant Schwanz's posting of the athletic director's contact information, because he has "felt a difference in the communication with [his] boss as communication has died down between us," which he believes is due to "people calling in."

### 2.   *Defendant Brookfield*

Plaintiffs' claim against defendant Brookfield arises from information she posted to the NEEd Facebook group regarding plaintiff Shannon.

Brookfield has two children who attend Newberg public schools. Brookfield joined NEEd in "connection with the debate around, passage of, and fallout from" the Ban.

On August 17, 2021, another participant in NEEd posted that, according to a website that Shannon had created to promote his campaign for School Board, Shannon worked at Selectron Technologies, and that participant also posted the web address for Selectron Technologies. On his campaign website, Shannon wrote that he worked as a Senior Project Manager at Selectron Technologies. Shannon also listed Selectron Technologies as his employer on his LinkedIn page.[13]

---

[13] LinkedIn is a social media site that "emphasizes professional networking." Brian Van Wyk, *We're Friends, Right? Client List Misappropriation and Online Social Networking in the Workplace*, 11 Vand J Ent & Tech L 743, 746 (2009). It claims to be "the world's largest professional network" and that it has "more than 930 million members" worldwide. *See https://about.linkedin.com/* (accessed May 11, 2023).

After seeing the post identifying Shannon's employer, Brookfield searched "Selectron Technologies" on Google and saw the phone number for Selectron Technologies in the "knowledge panel" on the top right of the Google page. Brookfield copied the phone number from the Google search and posted the following in the NEEd Facebook group, replying to the message described above identifying Shannon's employer as Selectron Technologies:

> "[phone number for Selectron Technologies], please call them and express your concerns about his demonstrated behavior. I'd avoid hearsay."[14]

According to a declaration submitted by Brookfield, she posted the phone number for Selectron Technologies because she believed that Shannon "would benefit from equal-opportunity training, and [she] hoped that his employer would provide it," and because she wanted Shannon "to understand how his policies were harming marginalized members of our community." She also wanted to ensure Selectron Technologies was "aware of and able to participate in the public discussion of which they had become a part."

According to a declaration submitted by Shannon, as a result of Brookfield posting the phone number for Selectron Technologies in the NEEd Facebook group, he was "subjected to severe emotional distress," such that he "experienced and continue[s] to experience anxiety, fear, and apprehension." As a result of Brookfield's post, Shannon can "no longer eat out in [his] community"; he had to "call the police because of activity outside [his] house that [he] believe[s] is connected to the disclosure"; he has had trouble sleeping and installed a video camera outside his house. Additionally, he lost his employment at Selectron Technologies, which he "believes" was a "direct result of people contacting [Selectron Technologies] after Brookfield disclosed their contact information."

### 3. *Defendant Tofte*

Plaintiffs' claim against defendant Tofte arises from information she posted to the NEEd Facebook group regarding plaintiff DeHart.

_____

[14] As indicated, Brookfield's post contained the phone number for Selectron Technologies. We have omitted the phone number in this opinion.

Tofte is employed as a humanities and drama teacher in the Newberg School District. At the time of her conduct that gives rise to the suit against her, she had a son that was a student at Newberg High School. Her son was very upset by the Ban because "his friends who identify as part of the LGBTQ+ or BIPOC community expressed to him that the [Ban] made them feel like they didn't matter." Tofte joined NEEd in an effort to "support students like [her] son's friends and oppose the [Newberg] ban." Shortly after the Ban was passed, an individual who was a member of the NEEd group posted a message reading:

> "I have hesitated to ask this but have thought long on it. I'd like to know where the 4 board members and their spouses work so that I can avoid giving them my business and letting their employer know why.

> "These people have negatively impacted my job and hurt my family. I think it's only fair I respond in this type of way."

Shortly thereafter, Tofte, who had previously learned from a different NEEd user that DeHart worked at Lam Research, searched for Lam Research on Google and found its publicly available "Core Values" webpage. Although it is not clear how that other NEEd user learned that DeHart worked at Lam Research, DeHart did publicize his work for Lam Research on his LinkedIn page. Tofte, who believed that DeHart's vote on the Ban conflicted with Lam's Core Values, responded with the following message:

> "Key tenants for Lam Research, the employer of Trevor DeHart. This is their dedication to education. Read the last section, 'Quality of Life' and you'll see just in that tidbit how DeHart's values conflict with his employers."

She appended to that message a link to Lam Research's website. She then posted the following message:

> "Here are the Core Values of Lam Research:

> "Achievement

> "Agility

> "Inclusion & diversity (WHAT? How does DeHart stand to work for these people?!)

"Innovation and continuous improvement

"Mutual trust & respect (AGAIN. . . WHAT? Does DeHart know this about his employer?!)

"Open communication

"Ownership & accountability

"Teamwork. (He seriously can't know this. And he remains working for them. Someone should point out these Core Values to him. He needs to know this info! They seriously conflict)."

Tofte later wrote, in response to another NEEd group member questioning the ethics of posting plaintiffs' employment information:

"I think what people are seeing is their political values are impacting every single employee in the Newberg School District. I don't want anyone to get fired, but I would like to see them held accountable for their actions, which are politically fueled in a role that should be one of objectivity. I think many Newberg staff feel like [Brown, Shannon, and DeHart are] creating a hostile work environment."

According to a declaration submitted by DeHart, he was "subjected to severe emotional distress" by Tofte as a result of the above-mentioned Facebook posts by Tofte, such that he experienced and continues to experience anxiety, fear, and apprehension. That fear and apprehension has changed where he goes out to eat, caused him to be conscious about where he is in public places, resulted in restless nights on a frequent basis for many months, caused him to keep "personal protection nearby" when he sleeps, and resulted in anxiety "both at home and away in the form of situational awareness." Additionally, DeHart averred that he believes his employer "received unsolicited contacts" in response to Tofte's posting.

D.  *The Instant Litigation*

After Schwanz's, Brookfield's, and Tofte's posts on Facebook regarding Brown's, Shannon's, and DeHart's employers, respectively, plaintiffs filed suit under ORS 30.835, which, as noted, creates a cause of action for "improper disclosure of private information." The complaint

alleged that each defendant, with intent to "harass" plaintiffs (*i.e.*, cause "severe emotional distress" to plaintiffs) caused "personal information" (*i.e.*, contact information for plaintiffs' employers) to be disclosed; that defendants "knew or reasonably should have known that plaintiffs did not consent to that disclosure"; that plaintiffs were "harassed" by the disclosure (that is, they suffered "severe emotional distress"); and that "a reasonable person would be harassed by the disclosure."

After the complaint was filed, each defendant filed a motion under Oregon's anti-SLAPP statute, contending, among other points, that their conduct was "in furtherance of the exercise of the * * * constitutional right of free speech in connection with a public issue or an issue of public interest," ORS 31.150(2)(d), and further contending that plaintiffs could not establish a *prima facie* case for "improper disclosure of private information" under ORS 30.835.

In a letter opinion, the trial court denied defendants' special motions to strike. With regard to defendants Tofte and Brookfield, who, as noted, were alleged to have posted "contact information" about plaintiffs Shannon's and DeHart's employers—a phone number and a website, respectively—the court ruled that "it is unclear from the record why such employment or the values of those private entities would be a matter of public interest." The court observed that "[t]here are many situations in which the private employment of a public servant can be deemed a matter of public interest" but Tofte and Brookfield had failed to "establish [a] nexus" between the information they posted and a public interest, noting that "the record does not indicate that defendants' posts "contributed to a conversation about whether DeHart and Brown were technically qualified for their public positions; and the posts do not suggest that DeHart and Brown's employment influenced the controversial decisions they made." Thus, Tofte and Brookfield had failed, in the trial court's view, to establish a *prima facie* showing that their conduct was of the type described in ORS 31.150(2)(d), *e.g.*, conduct "in furtherance of the exercise of the * * * constitutional right of free speech in connection with a public issue or an issue of public interest."

With regard to defendant Schwanz, who posted information concerning plaintiff Brown's employer—namely, the contact information for the Canby athletic director—the trial court ruled that defendant Schwanz's post "was looking for students to share stories and experiences about having worked with Chair Brown in that capacity" and that that "post's connection to public school and to public school students clearly implicates matters of public interest" and "involves conduct in the furtherance of protected speech" under ORS 31.150(2)(d). Nevertheless, the trial court denied defendant Schwanz's special motion to strike, concluding that Brown had established, "via substantial evidence, that he has a *prima facie* case." As the trial court saw it, plaintiff Brown made a *prima facie* case that (1) "Schwanz made a post that contained detailed contact information for plaintiff Brown's boss"; (2) "plaintiff Brown *** suffered damages as a result of that disclosure"; and (3) defendant Schwanz "researched, identified, and then disclosed details about who Brown's boss was and how to reach that individual," and a "factfinder could reasonably conclude that defendant Schwanz knew or should have known that plaintiff Brown did not consent to that information being disclosed." The trial court declined to rule on the overall constitutionality of ORS 30.835.[15]

## III.   ANALYSIS

As noted, on appeal, defendants contend that the trial court erred in denying their special motions to strike. "We review for legal error a trial court's ruling on an ORS 31.150 special motion to strike." *Mullen*, 271 Or App at 704. For the reasons explained below, we agree with defendants that the trial court erred.

A.  *Anti-SLAPP Step 1: Was defendants' conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or issue of public interest?*

As noted above, a defendant making a special motion to strike has the initial burden to make a *prima facie*

---

[15] In the trial court's view, the constitutionality of ORS 30.835 was not "fully fleshed out in the record." Further, the trial court had "questions about whether notice and an opportunity to be heard must be provided to the Oregon Attorney General before the constitutionality of [ORS 30.835] could be decided" and believed "a special motion to strike is not the procedural vehicle to raise and decide a constitutional challenge."

showing that the plaintiff's claim is of the type described in ORS 31.150(2). Relevant to this case is ORS 31.150(2)(d), which "broadly authorizes the filing of an anti-SLAPP motion 'against any claim in a civil action that arises out of *** [a]ny *** conduct in furtherance of *** the constitutional right of free speech in connection with a public issue or an issue of public interest.'"[16] *Neumann v. Liles*, 295 Or App 340, 344, 434 P3d 438 (2018), *rev den*, 365 Or 195 (2019) (quoting ORS 31.150(2)(d); omissions and brackets in *Neumann*). We analyze this first step of the anti-SLAPP statute only with respect to defendants Tofte and Brookfield, as the trial court ruled defendant Schwanz had met her burden under the first step of the anti-SLAPP statute, and plaintiffs do not challenge that ruling.

In considering whether a claim arises from any conduct "in furtherance of *** the constitutional right of free speech in connection with a public issue or an issue of public interest," ORS 31.150(2)(d), our inquiry concerns, generally, "what sort of claim [it] is." *Mullen*, 271 Or App at 705 ("The first part of the inquiry aims merely to assess more generally what sort of claim this is—in this case, is it one that arises out of conduct in furtherance of free speech in connection with an issue of public interest?"). That inquiry is not an inquiry into whether the defendant's conduct was wrongful. *Id.* ("The second part of the statutory inquiry in ORS 31.150(3) addresses the merits of the plaintiff's claim against the defendant and, necessarily, whether a *prima facie* case has been made as to the wrongfulness of the defendant's conduct.").

---

[16] Plaintiffs contend that ORS 31.150(2)(d) is not applicable, because defendants' conduct consisted of written statements, and this appeal should therefore be analyzed under ORS 31.150(2)(c), which allows special motions to strike when claims arise from "[a]ny oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest." They then argue that ORS 31.150(2)(c) does not cover the claims at issue here, because defendants' written statements were not made in "a place open to the public or a public forum," as the NEEd Facebook group is a private group not a public group. *See* 326 Or App at 723 n 3 (discussing types of Facebook groups).

Plaintiffs' argument fails; we have previously analyzed statements written online under ORS 31.150(2)(d). *Neumann v. Liles*, 295 Or App 340, 344, 434 P3d 438 (2018), *rev den*, 365 Or 195 (2019) (ORS 31.150(2)(d) applicable to written, online review of wedding venue).

To satisfy the standard set forth in ORS 31.150 (2)(d), a defendant must demonstrate both that their conduct (1) was "'in furtherance of *** the constitutional right of free speech'"; and (2) was "'in connection with a public issue or an issue of public interest.'" *Neumann*, 295 Or App at 344 (quoting ORS 31.150(2)(d); omission in *Neumann*).

Although we have not yet considered and drawn the precise outer limits of what activity can be said to be "in furtherance of *** the constitutional right of free speech" under ORS 31.150(2)(d), courts considering an identically worded provision of California's anti-SLAPP statute—which, as noted, is the statute upon which Oregon's anti-SLAPP statute was modeled—have noted that it "seems to suffice *** that the defendant's activity is communicative." *Hilton v. Hallmark Cards*, 599 F3d 894, 904 (9th Cir 2010). And we have held that if activity is protected by the First Amendment to the United States Constitution, then that activity is "in furtherance of *** the constitutional right of free speech" under ORS 31.150(2)(d). *See Neumann*, 295 Or App at 344 (defendant's act of publishing such an opinion online qualified as "conduct in furtherance of *** the constitutional right of free speech" for purposes of ORS 31.150(2)(d), because the right to post an "opinion of that nature" is part of the "First Amendment right to free speech"). But, under our case law, a defendant need not demonstrate that their conduct was protected under the First Amendment to be conduct "in furtherance" of the "constitutional right to free speech." *See Mullen*, 271 Or App at 705 (noting the merits of the plaintiff's claim against the defendant are addressed at the second step of the anti-SLAPP inquiry).

Regarding what it means for conduct to be "in connection with a public issue or an issue of public interest," we have interpreted "issue of public interest" to have its "common-sense meaning"—namely, an issue that is of interest to the public. *Neumann*, 295 Or App at 345; *see also Maloney v. T3Media, Inc.*, 94 F Supp 3d 1128, 1134 (CD Cal 2015), *aff'd*, 853 F3d 1004 (9th Cir 2017) (noting that courts in California have interpreted "an issue of public interest" to mean "any issue in which the public is interested" (internal quotation marks omitted)).

Applying those standards here, we conclude that defendants met their burden. First, regarding whether each defendant's conduct was "in furtherance of the exercise of the *** constitutional right of free speech," we highlight that the First Amendment "does not preclude *** threatening *social ostracism* or *vilification* to advocate a political position." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F3d 1058, 1086 (9th Cir 2002), *as amended* (July 10, 2002), *cert den*, 539 US 958 (2003) (emphases added). Nor does it preclude speech that "embarrasses" or "coerces" another into certain action. *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 US 886, 910, 102 S Ct 3409, 73 L Ed 2d 1215 (1982) (observing that speech "does not lose its protected character *** simply because it may embarrass others or coerce them into action").[17]

Here, Brookfield and Tofte engaged in "communicative" conduct: In the NEEd Facebook group, Brookfield posted the phone number for Shannon's employer, Selectron Technologies, and Tofte posted the website for DeHart's employer, Lam Research. Brookfield posted the phone number of Selectron Technologies so people could engage in conduct likely protected by the First Amendment—specifically, expressing "their concerns about [Shannon's] demonstrated behavior." And Tofte posted information concerning DeHart's employment in the context of a proposed boycott of DeHart's employer, and she encouraged members of the NEEd group to engage in conduct likely protected by the First Amendment—namely, communicating with DeHart himself. As noted above, we need not decide whether Tofte's and Brookfield's conduct itself was protected by the First Amendment. We conclude, however, that that conduct was "in furtherance of the exercise of the *** constitutional right of free speech" under Oregon's anti-SLAPP statute.

Second, regarding whether each defendant's conduct was in "connection with a public issue or an issue of

---

[17] We understand the United States Supreme Court's use of the word "coerce" in *N. A. A. C. P.*—a case in which individuals sought to persuade others to join a boycott "through social pressure and the 'threat' of social ostracism," 458 US at 910-11—to have a different meaning than the use of that word in the Oregon statutes concerning stalking protective orders. *See* ORS 163.730(1) ("'Coerce' means to restrain, compel or dominate by force or threat.").

public interest," bearing in mind that we "liberally" construe the anti-SLAPP statute "in favor of the exercise of the rights of expression" it protects, ORS 31.152(4), we conclude that it was.

Notably, both Shannon and DeHart were elected public officials who were in the public eye as a result of their stance on an issue that affected a large number of people. *Cf. Living Vehicle, Inc. v. Kelley*, 2:22-CV-06226-RGK-AS, 2023 WL 2347442 at *4 (CD Cal Jan 20, 2023) (noting "California courts have described three categories of statements that address issues of public interest: (1) a statement that concerns a person or entity in the public eye; (2) statements that could directly affect a large number of people beyond the direct participants; and (3) statements that involve a topic of widespread, public interest" (internal quotation marks omitted)); *Jackson v. Mayweather*, 10 Cal App 5th 1240, 1254, 217 Cal Rptr 3d 234 (2017), *as modified* (Apr 19, 2017) ("In general, a public issue is implicated if the subject of the statement or activity underlying the claim was a person or entity in the public eye." (Internal quotation marks, brackets, and ellipsis omitted.)); *see also Gertz v. Robert Welch, Inc.*, 418 US 323, 344, 94 S Ct 2997, 41 L Ed 2d 789 (1974) ("[S]ociety's interest in the officers of government is not strictly limited to the formal discharge of official duties.").

Further, there can be no dispute that the Ban itself was an issue of significant public interest, having received local, statewide, and national media attention. Although the trial court did not see any "nexus" between the posting of DeHart's employer's website and Shannon's employer's phone number, on the one hand, and an issue of public interest, on the other, the posting of DeHart and Shannon's employment information furthered lawful forms of civic engagement on that issue by members of the public—such as boycott—and informing DeHart's and Shannon's employers of the reason for the boycott. *Cf. Brayshaw v. City of Tallahassee, Fla.*, 709 F Supp 2d 1244, 1249 (ND Fla 2010) (explaining that publication of the home addresses and phone numbers of police officers was "linked to the issue of police accountability," which is an issue of "legitimate public interest," because it aids in "achieving service of process,

researching criminal history of officers, organizing lawful pickets, and other peaceful and lawful forms of civic involvement that publicize the issue"); *Publius v. Boyer-Vine*, 237 F Supp 3d 997, 1013-14 (ED Cal 2017) (noting "several cases demonstrate that the First Amendment protects the right to publish highly personal information of private individuals, such as the names of rape victims and juveniles involved in legal proceedings, when they relate to matters of public concern" and collecting cases).

We also think that the particular conduct giving rise to the cause of action in this case—posting "contact information" for plaintiff's employers—cannot meaningfully be separated, under the first step of the anti-SLAPP statute, from the larger political conversation that was taking place in the NEEd Facebook group in response to an issue that had both drawn widespread media attention and had actual impacts on the lives of those attending and working in Newberg public schools. *See Mullen*, 271 Or App at 706 (trial court erred in narrowing the focus of the first step of the anti-SLAPP statute "to the specific portion of defendants' conduct that plaintiffs found objectionable").

For those reasons, we conclude that Brookfield and Tofte met their burdens under the first step of the anti-SLAPP statute. We emphasize that in reaching the conclusion that Brookfield and Tofte have met their burden under the first step of the anti-SLAPP statute we are not making a normative judgment as to the societal acceptability and utility of posting information concerning the private employers of DeHart and Shannon online. But, as the United States Supreme Court has observed in a different but related context, the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 US 378, 387, 107 S Ct 2891, 97 L Ed 2d 315 (1987).[18]

---

[18] Plaintiffs posit that if "all information related to private employment of public officials are *per se* matters of public interest, the legislature enacted a statute in direct conflict with ORS 31.150 [(the anti-SLAPP statute)] when they created ORS 30.835 [(the anti-doxing statute)]." We do not hold "all information related to private employment of public officials are *per se* matters of public interest." But, in any event, there is no conflict between ORS 31.150 and ORS 30.835. The former, the anti-SLAPP statute, as noted, is a procedural mechanism to allow defendants, before incurring significant expenses, "to expeditiously move

B.   *Anti-SLAPP Step 2: Did plaintiffs meet their burden of presenting substantial evidence in support of a* prima facie *case on the anti-doxing claims?*

Having concluded that Brookfield and Tofte have met their burden under the first step of Oregon's anti-SLAPP statute, we turn to the second step and consider whether plaintiffs in the action have established "that there is a probability that the plaintiff[s] will prevail on the claim[s] by presenting substantial evidence to support a *prima facie* case." ORS 31.150(3). Here, because the trial court ruled against defendants Tofte and Brookfield on the initial inquiry, it did not reach the question of whether plaintiffs had made the necessary showing under the second step of Oregon's anti-SLAPP statute with regard to those two defendants. However, that question was fairly presented to the trial court, and the record is sufficiently developed to enable our review. Accordingly, we proceed to that inquiry with regard to all defendants. *See Mullen*, 271 Or App at 707 (taking that approach).

As set forth above, to prevail on their claims for "improper disclosure of private information" under ORS 30.835(2), plaintiffs must establish "by a preponderance of the evidence" that:

"(a)   The defendant, with the intent to stalk, harass or injure the plaintiff, knowingly caused personal information to be disclosed;

"(b)   The defendant knew or reasonably should have known that the plaintiff did not consent to the disclosure;

"(c)   The plaintiff is stalked, harassed or injured by the disclosure; and

"(d)   A reasonable person would be stalked, harassed or injured by the disclosure."

As noted, in this case, plaintiffs alleged that they were "harassed" by the disclosure of their personal information and that a "reasonable person would be harassed by the

---

to dismiss nonmeritorious claims that were filed in a strategic effort to chill participation in public affairs." *C.I.C.S. Employment Services*, 291 Or App at 319 (internal quotation marks omitted). The latter, the anti-doxing statute, creates a substantive cause of action.

disclosure." Oregon's anti-doxing statute defines "harass" to mean to

> "subject another to *severe emotional distress* such that the individual experiences anxiety, fear, torment or apprehension that may or may not result in a physical manifestation of severe emotional distress or a mental health diagnosis and is protracted rather than merely trivial or transitory."

ORS 30.835(1)(c) (emphasis added).

On appeal, defendants challenge various aspects of plaintiffs' attempt to make a *prima facie* case. We need not address the majority of those challenges by defendants, because, as explained below, we conclude that plaintiffs' claims fail because plaintiffs did not make a *prima facie* showing that reasonable people in plaintiffs' positions would suffer severe emotional distress as a result of defendants' disclosures of plaintiffs' "personal information."[19] In reaching that conclusion, we note that, whether the facts and circumstances would allow for a determination that emotional distress was objectively reasonable is a legal question. *See T. M. E. v. Strope*, 307 Or App 156, 160, 476 P3d 972 (2020) (reversing issuance of permanent stalking protective order where there was "insufficient evidence from which the trial court could conclude, given the circumstances, that petitioner's alarm was objectively reasonable"); *see also Restatement (Second) of Torts* § 46 comment j (1965) ("It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.").

Before turning to the facts of this case, we emphasize four observations that inform our analysis.

---

[19] In particular, we highlight that, on appeal, defendants advance an argument that Tofte posting the website of DeHart's employer did not constitute disclosing "contact information" under ORS 30.835(1)(d)(B). However, given that we conclude plaintiffs failed to make a *prima facie* case that a reasonable person in their circumstances would be harassed, we need not reach that argument.

Similarly, we need not address the merits of defendants' arguments that the anti-doxing statute, as applied to defendants, violates Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution; that defendants did not know, and could not have known, that plaintiffs objected to the posting of their publicly available employment information; and that plaintiffs failed to present *prima facie* evidence that they were actually harassed or that any harassment was caused by defendants.

First, ORS 30.835 does not define "severe emotional distress," other than that it means "anxiety, fear, torment or apprehension" that is "protracted" rather than "trivial or transitory," and the legislative history does not shed additional light on the meaning of "severe emotional distress." However, it is evident from the definition of "harass" that not all emotional distress is sufficient to assert a cause of action under ORS 30.835; rather, the emotional distress must be "severe" in nature. *See Webster's Third New Int'l Dictionary* 2081 (unabridged ed 2002) (defining severe as "of a great degree or undesirable or harmful extent"). Under our case law, a determination of whether emotional distress is "severe" requires consideration of its "duration and intensity." *Checkley v. Boyd*, 170 Or App 721, 742, 14 P3d 81 (2000), *rev den*, 332 Or 239 (2001); *see also Dept. of Transportation v. Stallcup*, 341 Or 93, 99, 138 P3d 9 (2006) ("[W]e give words that have well-defined legal meanings those meanings."). And the *Restatement* section 46 comment j provides the following explanation of "severe" emotional distress:

> "Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. *** The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress ***."

Second, for a disclosure of "personal information" to be actionable, the disclosure must be of the sort that would cause a "reasonable" person severe emotional distress. The word "'reasonable' inherently requires consideration of the relevant circumstances, as nothing is 'reasonable' or 'unreasonable' in a vacuum." *Dept. of Human Services v. D. E. A.*, 314 Or App 385, 392, 499 P3d 876, *rev den*, 368 Or 787 (2021); *see also id.* (citing *Webster's Third New Int'l Dictionary* 1892 (unabridged ed 2002) as defining "reasonable" to mean "being or remaining within the bounds of reason : not extreme : not excessive"); *J. D. K. v. W. T. F.*, 276 Or App 533, 538, 369 P3d 1181 (2016) (to determine whether "a petitioner's apprehension is objectively reasonable" for issuance of a stalking

protective order under the ORS 30.866, we "consider all of the circumstances of the parties' relationship").

Third, relatedly, each of the plaintiffs in this case is a "public official," not a "private individual." *See Gertz*, 418 US at 345 (drawing distinction between "public officials" and "private individuals"). Plaintiffs and defendants treat the fact that plaintiffs are public officials as a relevant circumstance in determining whether their "severe emotional distress" was "reasonable," and we agree that it is a relevant circumstance. As the United States Supreme Court has observed, "[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs," including that the individual "runs the risk of closer public scrutiny than might otherwise be the case," and has relinquished some part of their "interest in the protection of [their] own good name." *Id.* For example, "[c]ommunications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them," but "[n]o such assumption is justified with respect to a private individual."[20] *Id.*

Fourth, the statutory scheme indicates that the legislature did not contemplate that *any* "disclosure" of "personal information" of the type listed in ORS 30.835(1)(d) would cause a "reasonable person" to be "stalked, harassed or injured." That is evident because, if it were otherwise, then ORS 30.835(2)(d) requiring that the disclosure would cause a "reasonable person to be stalked, harassed or injured" would be surplusage. *State v. Stamper*, 197 Or App 413, 418,

---

[20] We pause to note that the legislative history of ORS 30.835, as described above, evinces a legislative intent that public officials are *not excluded* from the protections offered by ORS 30.835. *See, e.g.*, Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 10, 2021, at 53:36 (comments of Rep Ron Noble) ("This bill provides an avenue to protect *everyone*." (Emphasis added.)). We emphasize that we do not understand the legislature to have categorically excluded public officials from the protections offered by ORS 30.835.

Nevertheless, for the reasons stated, we believe the fact that a person is a public official is a relevant circumstance in determining whether "severe emotional distress" as a result of a disclosure of "personal information" was reasonable under ORS 30.835.

106 P3d 172, *rev den*, 339 Or 230 (2005) ("[W]e assume that the legislature did not intend any portion of its enactments to be meaningless surplusage.").

Having made those observations, we turn back to the facts of the instant case, and we conclude that, given all of the particular circumstances present here, "reasonable" people in plaintiffs' positions would not suffer "severe emotional distress," as those terms are used in Oregon's anti-doxing statute, ORS 30.835, as a result of defendants' disclosures.

To start, the identity of each plaintiffs' employer was information that each plaintiff had actively publicized, not information that any of the plaintiffs had sought to keep private: Plaintiff Shannon described his employment at Selectron Technologies on his School Board campaign website and his LinkedIn page; plaintiff DeHart included his employment with Lam Research on his LinkedIn page; and plaintiff Brown gave an interview to the *Canby Herald* in which he discussed both his employment as a tennis coach in Canby and his position on the School Board, and he put forth his work as a coach as a qualification for serving as a member of the School Board. We note that the purpose of professional networking websites such as LinkedIn, and the purpose of campaign websites, is to publicize information, not to keep such information private. And, generally speaking, it seems that statements are given to newspapers with the understanding that they will be published and read.

Moreover, the "personal information" that was published about each of plaintiffs' employers was information readily publicly available based on the information plaintiffs themselves had promoted either on campaign websites, LinkedIn, or in the *Canby Herald*. We think the public and readily available nature of the "personal information" disclosed bears on the reasonable amount of "emotional distress" that a public official might feel upon having that information disclosed.

Additionally, the type of personal information disclosed coupled with other circumstances of the disclosures militate against a determination that any "severe emotional distress" felt by plaintiffs as a result of the disclosures was

objectively reasonable. Regarding the nature of the personal information disclosed, in the case of Brown, it was the phone number and email address of his supervisor, the athletic director of Canby schools; in the case of DeHart, it was the website of his employer; and, in the case of Shannon, it was the phone number of his employer.

In no way do we minimize the emotional distress that might be felt as a result of such disclosures. But we note that ORS 30.835(1)(d) covers a variety of personal information, and we think that human experience teaches that the disclosures in this case might be less likely to cause a public official "severe emotional distress," as that term is used in Oregon's anti-doxing statute, ORS 30.835, than someone posting, for example, photographs of the public official's children, the public official's home address, and the names of the schools the public official's children attend. ORS 30.835(1)(d) ("personal information" includes "[p]hotographs of the plaintiff's children," "[i]dentification of the school that the plaintiff's children attend," and "plaintiff's home address"). And as noted, the statutory scheme indicates that the legislature did not contemplate that *any* "disclosure" of "personal information" of the type listed in ORS 30.835(1)(d) would necessarily cause a reasonable person to be "stalked, harassed or injured."

Other circumstances of the disclosures in this case also militate against a conclusion that any severe emotional distress felt by plaintiffs was reasonable. The disclosures of personal information here were made in a private Facebook group with around 649 members comprised mostly of parents of students in Newberg public schools. There is no evidence in the record that any actual violence, vandalism, stalking, or criminal activity had been linked to that group; and indeed, although each plaintiff had developed a belief that their employer was contacted, there is no direct evidence that anyone actually contacted Brown's, DeHart's, or Shannon's employer as a result of Schwanz's, Tofte's, and Brookfield's disclosures. In that regard, we note that the doxing of Brown, DeHart, and Shannon was less threatening than much of the doxing of public officials the legislature heard about when enacting ORS 30.835. *Cf.* Audio Recording, House Committee on Judiciary, Subcommittee

on Equitable Policing, HB 3047, Mar 10, 2021, at 43:12 (comments of Rep Bill Post) (describing being doxed on Twitter by a "national journalist" with 1.5 million followers, including the release of his Social Security number and a picture of his house); Audio Recording, House Committee on Judiciary, Subcommittee on Equitable Policing, HB 3047, Mar 1, 2021, at 51:00 (comments of Jon Isaacs) (describing doxing resulting in "attacks on the homes of elected officials" including an attempt to start a fire at one official's home).

In sum, we think that, given the supporting and opposing affidavits on file, plaintiffs failed to make a *prima facie* case that the severe emotional distress they suffered as a result of the disclosures of information about their employers was reasonable, as required to state a cause of action for improper disclosure of private information under ORS 30.835.

## IV.   CONCLUSION

We emphasize, again, that we are not making a normative judgment as to the societal acceptability and utility of posting information concerning the private employers of public officials on the internet.

Also, we again highlight that in no way do we minimize the emotional distress felt by plaintiffs Brown, Shannon, and DeHart, as attested to in their affidavits opposing defendants' special motions to strike.

Nevertheless, on this record, and within the context of Oregon's anti-doxing statute, we are compelled to conclude that plaintiffs did not meet their burden to proceed with their claim for improper disclosure of private information under ORS 30.835. Consequently, we reverse and remand.

Reversed and remanded.